COURT OF APPEALS DIV I
2018 OCT 29 AM 8: 37

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of B.W.K., dob 11/26/2014, | ) ) ) | No. 76675-9-I |
| A minor child. | ) ) ) | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) ) | |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) ) | |
| ASHLEY KNUCKLES, | ) ) ) | |
| Appellant. | ) | FILED: October 29, 2018 |

SCHINDLER, J. — The trial court interjected more than 800 times during a six-day termination trial, often engaging in lengthy examination of witnesses. While many questions sought clarification and were neutral, many other questions challenged the credibility of the mother and elicited evidence not presented by the parties. Although a court has broad discretion in a bench trial to question witnesses and control the proceedings, the cumulative effect of the court's interjections and questions in this case constitutes manifest constitutional error and denied the mother the due process right to a fair trial. We reverse the order terminating the mother's parental rights to B.W.K. and remand for a new trial before a different judge.

## FACTS

Ashley Knuckles is the biological mother of B.W.K., born November 26, 2014. Knuckles suffered from an addiction to opiates. When B.W.K. was nine days old, Knuckles' boyfriend "nodded off" and dropped the baby. B.W.K. suffered a severe head injury.

In January 2015, the Department of Social and Health Services (Department) placed B.W.K. in foster care and filed a dependency petition. Following a 16-month dependency, the Department filed a petition to terminate the mother's parental rights to B.W.K. During the 6-day trial, without objection, the court interjected and asked questions over 800 times. The court asked questions of every witness, including over 100 questions of the mother and a comparable number of questions of the social worker and the court-appointed special advocate (CASA). The court found the Department met its burden of proving the statutory elements to terminate the mother's parental rights to B.W.K.[1]

---

[1] The court must find the following statutory elements by clear, cogent, and convincing evidence:

    (a) That the child has been found to be a dependent child;

    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . [;]

    . . . ; and

    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1), .190(1)(a)(i). If the State satisfies these criteria, the court may terminate parental rights if it finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b).

The court found the mother was not credible. In particular, the court did not believe the mother's testimony that a photograph of B.W.K. and her boyfriend was taken at the Tacoma Mall in March or April of 2015. The court found instead that the "photo was actually taken between October 2015 and January 2016" when the boyfriend was prohibited from having unauthorized contact with B.W.K.

The court found the mother was "in compliance with her treatment, which includes behavioral therapy, monthly meetings, methadone dosing and UA[2] testing (all results negative)." But the court found the mother demonstrated an insufficient understanding or interest in the special needs of the child and an inability to meet those needs.

The court concluded there was little likelihood that conditions could be remedied so that B.W.K. could be returned to the mother's care in the near future and continuation of the parent-child relationship diminished the prospects for early integration into a stable and permanent home.

The court entered an order terminating the mother's parental rights to B.W.K.

ANALYSIS

The mother contends she is entitled to a new trial because the court violated her right to due process. The mother asserts that in addition to asking an excessive number of questions, the judge "took over the examination of witnesses," impeached and "aggressively cross-examined" her and her witnesses, "made sua sponte objections" to her attorney's questions, and "helped the State and CASA" in eliciting

---

[2] Urinalysis.

3

facts and evidence. Knuckles contends the court "crossed the line from impartiality to advocacy in favor of the State and against appellant."

RAP 2.5

The State correctly points out the due process claim is raised for the first time on appeal. Under RAP 2.5(a), this court "may refuse to review any claim of error which was not raised in the trial court." However, "manifest error affecting a constitutional right" may be raised for the first time on appeal. RAP 2.5(a)(3). Under RAP 2.5(a)(3), the mother must show " 'actual prejudice.' " State v. Kalebaugh, 183 Wn.2d 578, 584, 355 P.3d 253 (2015)[3] (quoting State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). Actual prejudice is " 'a plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.' " Kalebaugh, 183 Wn.2d at 584[4] (quoting O'Hara, 167 Wn.2d at 99). After careful review of the record, we conclude the trial court's interjections and questioning constitute manifest constitutional error and actual prejudice.[5]

Right to a Fair Trial

The Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington State Constitution protect against the deprivation of a

---

[3] Internal quotation marks omitted.

[4] Internal quotation marks omitted.

[5] The mother also contends the court violated the appearance of fairness doctrine. Because the appearance of fairness doctrine is not constitutional in nature, we do not consider the argument for the first time on appeal. RAP 2.5(a)(3); In re Guardianship of Cobb, 172 Wn. App. 393, 404, 292 P.3d 772 (2012); State v. Morgensen, 148 Wn. App. 81, 90-91, 197 P.3d 715 (2008). The federal authorities she cites do not address whether appearance of fairness claims are of sufficient constitutional magnitude to be raised for the first time on appeal. However, our Supreme Court has unequivocally held that the "appearance of fairness doctrine, though related to . . . due process considerations, is not constitutionally based" and may not be raised as a matter of right for the first time on appeal. City of Bellevue v. King County Boundary Review Bd., 90 Wn.2d 856, 863, 586 P.2d 470 (1978). We are bound by the decision of our Supreme Court. Buck Mountain Owners' Ass'n v. Prestwich, 174 Wn. App. 702, 716, 308 P.3d 644 (2013).

4

person's liberty without due process of law. The right to a fair trial is a "fundamental liberty" protected by the Fourteenth Amendment and article I, section 3. Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); State v. Moreno, 147 Wn.2d 500, 507, 58 P.3d 265 (2002).

In general, a trial court does not violate the due process right to a fair trial by asking questions. Moreno, 147 Wn.2d at 506-12. Courts have the authority to interject and question witnesses and may, for example, interject to prevent undue repetition of testimony or ask a witness to clarify testimony. ER 614(b); In re Welfare of Burtts, 12 Wn. App. 564, 577, 530 P.2d 709 (1975); United States v. Morgan, 376 F.3d 1002, 1008 (9th Cir. 2004).

However, the due process right to a fair trial is implicated where the court crosses the line from neutral arbiter to advocate. See Moreno, 147 Wn.2d at 509-511. Although a judge has broad discretion to question witnesses in a bench trial, the judge cannot "take charge of a party's case or . . . become a clear partisan." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 614.5, at 618 (6th ed. 2016); Moreno, 147 Wn.2d at 509-511. "A trial court should not enter into the 'fray of combat' or assume the role of counsel." State v. Ryna Ra, 144 Wn. App. 688, 705, 175 P.3d 609 (2008) (quoting Egede-Nissen v. Crystal Mountain, Inc., 93 Wn.2d 127, 141, 606 P.2d 1214 (1980)). The greater the involvement of the court, the higher the likelihood the judge is effectively usurping the role of counsel, which calls for reversal. See United States v. Hickman, 592 F.2d 931, 932, 936 (6th Cir. 1979) (convictions reversed where the trial

5

court interjected in proceedings more than 250 times, the constant interruptions "frustrated the defense" and infringed right of cross-examination, and the court indicated disbelief in "the defense story").

In determining whether a court's interjections and questioning violate the due process right to a fair trial, courts consider the proceedings as a whole and examine a number of factors, including the frequency and nature of the court's questions, whether the court waited until after counsel questioned the witness, whether the court's questions were clarifying or adversarial, whether the court interjected sua sponte in favor of one party, whether the questioning was impassioned or accusatory, and whether the court usurped counsel's role. See Moreno, 147 Wn.2d at 507-12; United States v. Pena-Garcia, 505 F.2d 964, 967 (9th Cir. 1974); United States v. Saenz, 134 F.3d 697, 702-05 (5th Cir. 1998); United States v. Singer, 710 F.2d 431, 436-37 (8th Cir. 1983); United States v. Van Dyke, 14 F.3d 415, 418-20 (8th Cir. 1994).

We conclude the trial court's interjections and questioning in this case violated the mother's due process right to a fair trial. The sheer number of questions asked by the court is problematic and usurped the role of counsel. But the timing and nature of the questions show the court crossed the line between neutral arbiter and advocate. Instead of waiting to ask questions until after counsel finished speaking, the court interjected relatively early and often during the examination of witnesses. The court disrupted the presentation of evidence and exhibited a level of involvement more akin to an advocate than a neutral arbiter. As the following excerpts demonstrate, the court too often commandeered witness examinations, engaged in hostile and advocate-like questioning, and elicited evidence favoring the Department.

The Department called Knuckles as its first witness. Shortly after the Department began questioning her, the court interjected:

THE COURT: . . . I want to draw your attention to page 8 [of the agreed order of dependency], okay, and Provision 4.4, are you there? Where it says Placement?

. . . .

THE WITNESS: Sorry. These pages are stuck together. Yes, I do see that.

THE COURT: And it says, "DSHS[6] Supervising Agency is authorized to place the child with a relative who is willing, appropriate and available with reasonable — prior reasonable notice to the party subject to review by the Court. DSHS shall initiate a home study of the maternal grandmother's home in her home state [of Tennessee] as well as the sibling [A.Y.]'s paternal grandmother's home in Kentucky. However, the court order shall be entered before [B.W.K.] is placed outside of Washington State."

Did you read that before you signed this order?

THE WITNESS: [My attorney and I] went through it briefly, but —

THE COURT: So you knew that there was no promise from this order that the child was going to be placed with your mother, right?

THE WITNESS: That's just what I thought when I was signing it, honestly.

THE COURT: Contrary to what it says?

THE WITNESS: Just by what me and the social worker talked about, she just mentioned that [the children] would be out of foster care and with my mom if I signed the paper.

THE COURT: Ms. Knuckles, did you read this order?

THE WITNESS: I can't say that I did, no, ma'am.

THE COURT: Okay.

THE WITNESS: We went through it, but it wasn't — you know, it was just very brief. It was only a few minutes of time that we were together.

[(Department's attorney briefly questions witness.)]

THE COURT: There were hearings after [B.W.K.'s placement in foster care] that you attended. Are you saying [your lawyer] was not telling the court what you wanted to say about how promises had been made that weren't reflected in the order?

THE WITNESS: Well, yes, that's true.

THE COURT: I see. When was the first time you complained that there were promises made to you that weren't reflected in the orders?

THE WITNESS: As soon as I had knowledge a little bit about what's happening, you know, I feel like this —

---

[6] Department of Social and Health Services.

THE COURT: When was that, Ms. Knuckles, that you actually made a statement to somebody saying, "This isn't what I agreed to?"

THE WITNESS: It — I know I did it at court when we went when I seen [sic] [my lawyer] at court, but I don't recall a specific date it was.

THE COURT: Did you say this to anybody other than [your lawyer]?

THE WITNESS: Everybody that I've been involved with so far, yes.

THE COURT: So you've said it to your social workers and you've said it to the CASA?

THE WITNESS: That — I'm sorry, said what?

THE COURT: That — that this order didn't reflect what you've been promised.

THE WITNESS: Oh, yes, I talked to my first social worker about it, Cynthia, because she was the one that originally told me.

THE COURT: Anybody else you talked to besides Cynthia and [your lawyer]?

THE WITNESS: Not that I recall.

THE COURT: Okay. Back to you, [Counsel].

[(3 pages of questioning by Department's attorney.)]

THE COURT: Did it occur to you to maybe read the orders to see what they wanted you to do?

THE WITNESS: I was not aware of an order.

THE COURT: Really? You weren't reading any of these court orders that said what services you were required to do?

THE WITNESS: Oh, I had — yeah, I had the paper from the Department that said the — with the — established paternity and the random UAs and stuff, but —

THE COURT: Mm-hmm. And nothing in those said that you had to be off methadone, right?

THE WITNESS: Yeah.

THE COURT: Okay.

[(22 pages of extensive questioning by Department's attorney, several interjections by court.)]

THE COURT: I'm going to stop you here and ask [Knuckles] something else.

What are [B.W.K.]'s particular needs as compared to any other child? What are his special needs?

THE WITNESS: He's different because he needs extra attention. He — his balance and stuff is off, so he can't just be left alone like regular kids with other children. He needs attention 24/7[7], and that makes it different. He's more high risk than any other children with his needs.

THE COURT: Anything else?

THE WITNESS: No.

---

[7] Twenty-four hours a day, seven days a week.

THE COURT: That's it? That's all his needs, is extra attention and 24/7 care?

THE WITNESS: I mean —

THE COURT: Anything else a caregiver needs to give him?

THE WITNESS: Of course, he needs his medical stuff advised and —

THE COURT: What medical stuff needs to be advised?

THE WITNESS: All of his, you know, therapies and appointments and all that. They need to, you know, be taken seriously and —

THE COURT: And how often are those?

THE WITNESS: He's got the therapies that I'm allowed to go to. There are three of them and it's twice a week: Physical therapy, occupational therapy, and speech therapy.

THE COURT: If he returns to you, how are you going to meet his need for 24/7 care?

THE WITNESS: I will be there for him and be able to take care of him responsibly with the help of — and support of my family and my friend.

THE COURT: Which family?

THE WITNESS: My mother and grandmother and grandfather back home in Tennessee.

THE COURT: Does that mean you would take . . . [B.W.K.] back home to Tennessee?

THE WITNESS: If I was permitted, yes.

THE COURT: Okay. And who would be providing the 24/7 care back in Tennessee?

THE WITNESS: Well, I mean, I could and — until we got something set up like he is now where he goes to daycare and stuff, but I'd rather him not just be in daycare all day. If it was my choice I'd — you know, take care of him and stuff, and I have the family support and means to where I would be able to stay with him.

THE COURT: How do you know you've got family support to get 24/7 care in Tennessee? How do you know you have it?

THE WITNESS: They've told me. My — my parents and grandparents have told me that they would do anything to help me that they needed to and they have the means to.

THE COURT: And what's the plan for his three times a week therapies and appointments?

THE WITNESS: For back in Tennessee?

THE COURT: Wherever you're taking him.

THE WITNESS: I have researched different doctors and stuff for Tennessee and tried to reach out and see if they would be able to take him — you know, take him in and —

THE COURT: Who specifically have you researched? I mean, where — where are they?

THE WITNESS: There was — I can't remember their names specifically, but it was doctors out of Morristown and Knoxville, Tennessee and specialist — there are specialists and good healthcare in Knoxville, which is close to Tennessee back home.

THE COURT: It's in a different state, isn't it? Or it's still in Kentucky?

THE WITNESS: No, they're both in — no, Knoxville's in Tennessee.

THE COURT: Okay. So how far from your home would Knoxville be?

THE WITNESS: It's just like 30 minutes.

THE COURT: Okay. And who would be providing the care for [B.W.K.]? Name, a facility, or person?

THE WITNESS: It — I don't remember the name of the facility.

THE COURT: Do you know how often he'd be going?

THE WITNESS: Probably the same amount as he is now. I mean, I would set everything up where nothing would be changed except, you know, his living area, pretty much. He would still be going to his therapies and doctors and stuff.

THE COURT: Okay. Back to you.

[(Department's attorney asks Knuckles three questions.)]

THE COURT: How long have you been going [to visits and therapy sessions with B.W.K.] regularly?

THE WITNESS: I got my bus card in mid-December.

THE COURT: So you're saying that you've been attending regularly since mid-December?

THE WITNESS: Well, the visits got — ended up getting canceled in January, but it was — me and Donna [Woodruff of A Place Called Hope], the supervisor [of the visits with B.W.K.], thought it was just the second missed, but Genora [Chappell, a case manager at A Place Called Hope,] had it down as the third. So it ended up — because my text was delayed to her, and she didn't get it until three hours after time had passed. It was too late, and she said it was the third one so they got canceled.

THE COURT: So you haven't had visits since January?

THE WITNESS: No, they're — they're active now.

THE COURT: Okay. When were they reactivated?

THE WITNESS: Just a couple weeks ago.

THE COURT: Have you missed any since then?

THE WITNESS: No.

THE COURT: How about his therapies?

THE WITNESS: No, I haven't missed them since.

THE COURT: You haven't missed any since mid-December?

THE WITNESS: There might have been a Monday one or something at the Puyallup the — that one, but they're — if it conflicted — if the appointments conflicted with the visit, then I chose to go to the visit.

10

[DEPARTMENT'S ATTORNEY]:   If you —
THE COURT:   What?  You —
THE WITNESS:   It's — it's — it's the —
THE COURT:   You're saying [B.W.K.] was scheduled for visitation and therapy at the same time?
THE WITNESS:   No.  It's the — like, different appointments, like his doctors' appointments and stuff or if he had a visit that day and he had an appointment earlier that day, my concern was about making the buses and getting back to the appointment — to his visit on time.  So I would choose to go to the visit instead of try to go make it and missing the visit and risk missing the visit.  Does that make sense?
THE COURT:   Not really.[8]

This lengthy questioning demonstrates the trial court's involvement as well as its skepticism of and hostility toward the mother.  For example, the court's question, "Did it mean anything to you at all that people were telling you that your child <u>had about a zillion special needs</u> and you had to be there for him," if asked by the Department would have appropriately drawn an objection from the mother's counsel.[9]  When a judge in a bench trial engages in this type of argumentative questioning, it puts counsel in an extremely difficult position—object to the inappropriate questions and risk angering the trier of fact, or remain silent to minimize the risk of an adverse outcome.

Many of the court's questions also either elicited or facilitated the admission of evidence supporting the Department.  In the following excerpt, the court spends a considerable amount of time asking questions of two witnesses about a photograph of B.W.K. with the mother's boyfriend.  The significance of the photograph turned on whether it was taken at a time when the boyfriend was prohibited from attending visits.  The court dominated the questioning on this topic, starting with social worker Clarissa

---

[8] Emphasis added.
[9] Emphasis added.

11

Blackmer.

THE COURT: Okay. You got negative visitation reports at the first visit or at the first and second visit?

THE WITNESS: The first and second visit occurred in the same week, and so I got them approximately at the same time.

THE COURT: Was it the first or the second visit that corresponded with the posting of the pictures on Facebook?

THE WITNESS: The posting of the pictures —

[KNUCKLES' ATTORNEY]: Your Honor, again, no disrespect, objection as to hearsay.

THE COURT: It's not hearsay when she saw it herself —

[KNUCKLES' ATTORNEY]: I don't —

THE COURT: — on Facebook. The fact that it appeared on Facebook doesn't make it hearsay when it's photographs.

What was the relationship between the posting of the photographs in terms of when you saw them and the visit?

THE WITNESS: I do not recall actually the exact timing of when I saw the photographs. I know that I addressed it with the mother as soon as I saw them.

THE COURT: How, if at all, could you date what you were seeing in terms of what was posted on Facebook in terms of the visitation? I mean, how could you tell it wasn't some years earlier mall visit?

THE WITNESS: Well, at that point the child was not even a year old.

THE COURT: (Inaudible) just (inaudible) that.

THE WITNESS: The way I actually verified it — and I don't know if the CASA's already testified or not, but she can speak further. I actually connected to the CASA because she was receiving monthly photos of the child, and she frequently received photos while the child was at visits. So I requested copies of all of those photos. And that was how we were able to determine the exact date was because of the outfit that he was in at the mall in those photos and his size —

THE COURT: Uh-huh.

THE WITNESS: — his size, his shape. A four month old obviously looks significantly different than a ten or eleven month old. And so that was how we narrowed it down.

And I was on the phone with the CASA explaining what the concerns were while I was reviewing the pictures. And when we came across that and that the picture matched perfectly what he was wearing, his size, his developmental level at that point in time, that's how we knew it had occurred.

THE COURT: Who knew what the child was wearing on these two particular visits? I mean, where did that information come from?

THE WITNESS: The CASA had photos from the mall of — while the child was at the mall.

THE COURT: The CASA was there for one or both of these visits?

THE WITNESS: For part of the visit.

THE COURT: Both of them or one of them?

THE WITNESS: I — I don't recall on that one. I don't know —

THE COURT: Okay.

THE WITNESS: I don't know that I was aware that the CASA was there until I had asked her for pictures of [B.W.K.]. And I had asked her for the pictures to narrow it down on the developmental level that we're not talking about something that had occurred a month or two prior but something that was much more recent.

THE COURT: Okay. That part of this, the connection between the way the child looked in the photographs and the way he looked in the rest of the photographs, we'll await the CASA's testimony, but I want to come back to this timing. Okay. How soon was it after these visits that, however it was, whether via CASA or otherwise, these photographs came to your attention?

THE WITNESS: It would have been within the same week —

THE COURT: Okay.

[THE WITNESS]: — otherwise, we would have moved forward with the decreasing of the supervision.

THE COURT: Okay. And when you got this information about these photographs, and you looked at them, then what was the conversation between you and the mother then?

THE WITNESS: When I was able to reach her by phone, I expressed that there were some concerns as far as stepping down on visitation, and I wanted to take the time to talk with her about those concerns and hear her side of things before — before any formal decision was made as far as whether or not we were going to pursue the step-down on the visitation.

THE COURT: And how did you get in touch with mom?

THE WITNESS: I had to utilize the multiple phone numbers that I had until I found one that worked.

THE COURT: Okay. And what happened when you finally got a phone number that worked?

THE WITNESS: She had answered —

THE COURT: And what happened —

THE WITNESS: — on that one.

THE COURT: — then?

THE WITNESS: That's when I broached the subject with her in the manner I just described.

THE COURT: And what was mom's response?

THE WITNESS: Mom's response was initially complete denial that [the boyfriend] had been present at any visit stating it must have been

13

a visit from — the visits occurred at the DCFS[10] offices prior to us being aware that [the boyfriend] was not the father, which would have put the child four months — four months of age. And at that point he was nearly — he actually had turned one on Thanksgiving that year, so he just turned one.

There was — so I asked her about that. I also had brought up the concerns from the visitation reports about her not fully supervising [B.W.K.] and not yet demonstrating that she was going to watch him 100 percent of the time. Part of the concerns were that we didn't want [B.W.K.] being left with strangers while she went into the bathroom.

THE COURT: And what did mom say in response to those conversations?

THE WITNESS: She stated that it was all entirely false, and that both visitation — it must have been both reports. That both visitation agencies were lying to make her look bad. And that it was about the money because they would not get paid as much if it switched to monitored.

She then explained that she had documentation to prove all of this and wanted to provide that to me and asked to do an in-person meeting with me, which we scheduled to be I believe the following Thursday or Friday.

THE COURT: Okay.

THE WITNESS: And then that initiated I believe three or four months of my attempt to do that office visit or a phone conversation with her further.

THE COURT: So what happened to the scheduled meeting?

THE WITNESS: She never showed, and she repeatedly would call me after the timing of the meeting to explain why she no-showed for the first I want to say three scheduled meetings. And then after that it was on me to attempt to connect back with her since there was no reason — there was no call, no follow-up on why she no-showed.

THE COURT: So let me get this right. Mom said she had documentation, she scheduled a meeting with you to show it to you, and then she did not show up?

THE WITNESS: Correct.

THE COURT: Did she call you and tell you she wasn't coming?

THE WITNESS: After the fact, yes.

THE COURT: After the fact. And then you scheduled two more meetings?

THE WITNESS: I scheduled multiple more meetings?

THE COURT: I know I got it, but —

THE WITNESS: But.

THE COURT: — this initial time, you scheduled two more meetings after that?

---

[10] Division of Child and Family Services.

THE WITNESS:     Both of which she no-showed, correct.

THE COURT:     Okay.  Did she call you in advance of either one of those?

THE WITNESS:     No.

THE COURT:     Okay.  She called afterward to say why she hadn't appeared?

THE WITNESS:     That's correct.

THE COURT:     And then she didn't schedule another meeting with you?

THE WITNESS:     I continually tried to schedule those.  I continued my attempts to reschedule.  In our subsequent phone calls for her — after she had not shown up for the office visits, we had the conversation about [B.W.K.]'s medical needs and really wanting to make sure she was fully understanding, and she had asked while she was there in person if we could go over [the] medical records, and I expressed I was more than happy to do that, so we had planned on including that in our meeting.  And that was of vital importance for her to understand [the] medical needs in order to progress with moving [B.W.K.] home.

THE COURT:     Did you succeed in scheduling a meeting with her?

THE WITNESS:     No, I never did.

The court not only elicited detailed factual evidence that the Department had not presented, it assumed the role of advocate for the Department.  The court also argued with the mother's attorney on evidentiary objections to the court's own questions.

The court continued the questioning about the photograph during the testimony of the CASA Janet Belles:

Q     (By [CASA's attorney])     Earlier you testified that you could tell that [the photograph] was in a mall, and you gave an example of the chair —

THE COURT:     No, she said specifically she knew it was in this mall —

[CASA'S ATTORNEY]:     Okay.

THE COURT:     — where the mother had arranged for these test visits.  Okay.  She mentioned chairs.

Is there anything else in this photograph that tells you where this was?

THE WITNESS:     The overhead lights, the tile floors.  There is a store head up above here and there's, like, signs.  It's a mall.

THE COURT:     The mall or a mall?

THE WITNESS:     It's the Tacoma Mall.

15

THE COURT: Okay.

THE WITNESS: And on the heading it actually says, "[B.W.K.] and I chilling at the mall."

THE COURT: I know what it says, but —

THE WITNESS: Sorry.

THE COURT: — I'm not really considering what [the boyfriend] has to say for the truth of what he's saying here. Okay.

THE WITNESS: So I would say it is in a — in the Tacoma Mall where the visits have been happening.

THE COURT: Okay. So what is it about [B.W.K.]'s clothing you mentioned and [B.W.K.]'s appearance? Just didn't get — first of all, you said that you could tell that [B.W.K.] was toddler age. What was it you could tell about . . . age by looking at this photo?

THE WITNESS: This photo isn't as clear as the one that I did see.

THE COURT: Mm-hmm.

THE WITNESS: [B.W.K.] had a, like, a sweatshirt that had a train on it.

THE COURT: Okay. Slow down. Is this the photograph that you saw, a terrible reproduction of it?

THE WITNESS: Yes.

THE COURT: Okay. Then looking at this photograph, which is a terrible reproduction of the photograph you saw, is it accurate even though it's not a good reproduction?

THE WITNESS: Yes.

THE COURT: Okay. Looking at this photograph that accurately reproduces what you saw, tell me what it is, first of all, about [B.W.K.] that indicates the timing of this.

THE WITNESS: [B.W.K.'s] age.

THE COURT: Okay.

THE WITNESS: [B.W.K.] looks like . . . about 11 months there or a year.

THE COURT: Okay. And what is it about [B.W.K.'s] clothing?

THE WITNESS: I'm not understanding what you're asking.

THE COURT: You said before that there was something about what [B.W.K.] was wearing —

THE WITNESS: Yes.

THE COURT: — okay, that was important? What is it about what [B.W.K.]'s wearing that's important?

THE WITNESS: It was the same shirt that I had a picture of.

THE COURT: Do you remember if that picture showed up in any other photos he took or just on this one visit you took it when you were there?

16

THE WITNESS: Just — I didn't take this picture.

THE COURT: I know.

THE WITNESS: Oh, sorry. Say it again?

THE COURT: Well, from what you said, if I understand you right, Ms. Belles, this photograph shows [B.W.K.] wearing a shirt, yes?

THE WITNESS: Yes.

THE COURT: And you also had taken a picture of the shirt that he's wearing here at some point, right?

THE WITNESS: Oh, yes. Yes. Yes.

THE COURT: Okay. Do you know whether — when it was that you took the picture of the shirt that [B.W.K.]'s wearing here?

THE WITNESS: It's in my CASA October report. I think it's in the October report.

THE COURT: October or —

THE WITNESS: I am thinking it is now.

Q. (By [CASA's attorney]) Would looking at an October report help refresh your memory as to if that's the report?

A. Yes. Yes. Yeah.

. . . .

. . . .

Q (By [CASA's attorney]) I'm handing you what's been marked for identification purposes as CASA's Exhibit 153. If you could take a few moments and look at the front page of the date of your report and then the second page of a photograph, and see if it helps refresh your memory as to the date when you saw [B.W.K.] in that same shirt?

A. It looks like the hearing date was on 11/2/15.

THE COURT: What hearing date?

THE WITNESS: The —

THE COURT: Okay. So here's the question.

THE WITNESS: — permanency plan —

THE COURT: Can you — can you date the photograph? Your photograph, can you date it?

. . . .

[CASA'S ATTORNEY]: Can I follow up now?

THE COURT: Yeah.

. . . .

A. Oh, it's right there in front of me, yes, 10/29/2015. I apologize.

Q. Okay.

THE COURT: Okay. What's the significance of that?

THE WITNESS: That would tell me that that picture was around that time period.

. . . .

17

Q      (By [CASA's attorney])    And if you could turn to the very last page as well?
      THE COURT:    Around 10/29/15?
      THE WITNESS:    Yes.

During cross-examination, CASA Belles testified she had been mistaken when she said she recognized chairs in the mall photograph. The court interjected, steered the witness in a different direction, and at one point answered a question for the witness.

Q.     Okay. <u>I believe you've testified that you recognized that photo because of the chairs that you recognized. Where are the chairs in that photo?</u>
A.     I stated early [sic] that I was mistaken by my memory.
Q.     What were you mistaken about?
A.     That there were chairs. <u>There were no chairs.</u>
Q.     Okay.
      <u>THE COURT:    What is that chair to the left in the photograph?  Aren't those chairs?</u>
      THE WITNESS:    I think they're signs.
      <u>THE COURT:    No, to the left.  Behind the —</u>
      THE WITNESS:    Let me see it again.
      <u>THE COURT:    — just behind [the boyfriend]'s right ear.</u>
      THE WITNESS:    Let me see it again.
      [KNUCKLES' ATTORNEY]:    I'm sorry.
      <u>THE COURT:    Just behind [the boyfriend]'s right ear sitting on the floor there, aren't those chairs?</u>
      THE WITNESS:    <u>They could be, yes.</u>
      THE COURT: Okay.
Q      (By [Knuckles' attorney)    Is your testimony that you are seeing chairs or not seeing chairs, or you're not sure?
A.     From this picture it's not a good picture, <u>but that could be chairs in the center of the mall</u>, but the reason I know it's in the mall is tile floors, the heading of the stores, the overhead lights and the — there's, like, a directory up above that looks like it has wordings and an arrow may be pointing.
Q.     And how do you know it's a particular mall as compared to a different mall?
A.     Well, [B.W.K.]'s visits are supervised, so it would have to be where [B.W.K.] goes for his visits, and that would be at the Tacoma Mall.
Q.     Okay. But why couldn't it be a picture of [the boyfriend] with [B.W.K.] in a different mall that's not a supervised visit?

THE COURT:     Because how would the mother get access to the child, Counsel?

THE WITNESS:     She answered it.

THE COURT:     Yeah, I mean —

[KNUCKLES' ATTORNEY]:     Judge answered it?

THE WITNESS:     Yes.

THE COURT:     Yeah.

[KNUCKLES' ATTORNEY]:     Thank you.[11]

The court assisted the CASA attorney in laying the foundation for admitting e-mail exhibits during the cross-examination of B.W.K.'s foster mother and rejected the objections of the mother's attorney as "nuts."

Q.     (By [CASA's attorney])     . . . [W]e have in front of us an e-mail that is from [ ]123@hotmail, which I believe is your public e-mail account —

A.     Right.

Q.     — dated November 4th, 2016 on Friday.

THE COURT:     Okay. So, . . . let me ask you is your public e-mail account [ ]123@hotmail.com?

THE WITNESS:     Yes.

THE COURT:     Okay.

Q.     (By [CASA's attorney])     And —

THE COURT:     And that's the address you used to communicate with the mother?

THE WITNESS:     Yes.

THE COURT:     At her address of [ ]47@gmail.com?

THE WITNESS:     Yes.

THE COURT:     Okay.

. . . .

. . . .

[KNUCKLES' ATTORNEY]:     But, Your Honor, for the record [the foster mother]'s not authenticated that this is her e-mail because she doesn't have it in front of her to authenticate it, so I am objecting for the record.

THE COURT:     That's nuts . . . . She just said verbally that this is her e-mail. She doesn't . . . have to have it in front of her. Okay. Overruled.

. . . .

[KNUCKLES' ATTORNEY]:     Continuing objection. Thank you.

---

[11] (First alteration in original) (emphasis added).

19

THE COURT:    Noted. <u>I think we have sufficient authentication.</u> [12]

The court commandeered the examination of the mother's witness Bonnie Kosanovich.  Knuckles had been living with Kosanovich.  Less than two pages into the testimony, the court began aggressively questioning Kosanovich about the mother's future living arrangements and overruled objections to its own questions.

THE COURT:    When are you expecting [Knuckles] to move back to Tennessee?
THE WITNESS:    Well, hopefully, she really wants her son back, and then stay here as long as she needs to —
THE COURT:    Mm-hmm.  When —
THE WITNESS:    — until things are ready —
THE COURT:    — but when are you expecting her to leave, or are you?
THE WITNESS:    We have no expectations of that at the moment.
THE COURT:    Okay.  Do you expect her to leave next year or two years from now or five years from now?
THE WITNESS:    Just when she is ready, when she is able to.
THE COURT:    Okay.  Can you explain what that means?
THE WITNESS:    When she is ready to — I mean, just until she gets on her feet.
THE COURT:    And what does that mean?
THE WITNESS:    When you have a job, money, another place to go to.
THE COURT:    When she has a job, that's when she is going to leave to go back to another state?
THE WITNESS:    No.  Well, I'm sure she will have help from her room to go back there, but just when — she wants her child back and we will have her just, you know, until the Court says it's okay for her to move out of state.
THE COURT:    <u>Okay.  So we have a termination trial underway right now, right?</u>
THE WITNESS:    Yes.
THE COURT:    And you know that's why you're testifying?
THE WITNESS:    Yes.
THE COURT:    So when do you expect her to leave?
THE WITNESS:    There is no expectation.  No expectation on it.  She could stay as long as she wants.
THE COURT:    <u>Okay.  So you just want her to stay indefinitely?</u>

---

12 Emphasis added.

20

THE WITNESS:    Just until she is ready to leave.
THE COURT:    Have you talked to your husband about this?
THE WITNESS:    He is okay with it.
THE COURT:    No, I got that, but the two of you haven't discussed her termination date in your home?
THE WITNESS:    Well, if that happens, if it's terminated, then she could go back to Tennessee whenever she wants.
THE COURT:    So if this trial ends in termination, then she will return to Tennessee?  And if it doesn't end in termination, then you're going to keep her in the home until when?
[KNUCKLES' ATTORNEY]:    That calls for speculation.
THE COURT:    Overruled.
THE WITNESS:    Yeah.
THE COURT:    It's her home.
[KNUCKLES' ATTORNEY]:    Thank you.
THE WITNESS:    Well, it's okay with me that she stays as long as she can.
THE COURT:    Okay.  So if the trial doesn't end in termination, she can stay indefinitely?
THE WITNESS:    Yes.[13]

During cross-examination of a social worker, the court almost immediately cut off

the mother's attorney and challenged the attorney's understanding of the evidence

despite the absence of an objection from opposing counsel:

BY [KNUCKLES' ATTORNEY]:
Q.    You said it would be very difficult for A Place Called Hope to arrange feeding therapy at someone's home, correct?
    THE COURT:    No.  You misheard.  [The witness] said that she could arrange feeding therapy at A Place Called Hope.  She did arrange feeding therapy at A Place Called Hope.  Mom wasn't there for three feeding therapy sessions in a row, so it moved back to foster mother's home.
    [KNUCKLES' ATTORNEY]:    Okay.
Q.    (By [Knuckles' attorney])    So my question is —
    THE COURT:    She said it would be difficult —
Q.    (By [Knuckles' attorney])    — it possible —
    THE COURT:    — to arrange a supervised visit in a place like the foster mother's home, which is not a neutral location, but that's a different question from the availability of A Place Called Hope, which she said was available.
    [KNUCKLES' ATTORNEY]:    Okay.

---

[13] Emphasis added.

Q.    (By [Knuckles' attorney])    So it is possible to arrange therapy at a private home, correct?
    THE COURT:    No, [Counsel].  One more time she said a supervised visit needs to be in a neutral location.  She said that's why feeding therapy was arranged at A Place Called Hope until mother didn't appear for three successive therapy sessions.  That's what she said.  Anything else you want to ask her?
    [KNUCKLES' ATTORNEY]:    Okay.  Well, I wanted to ask that question, but that's fine.
    THE COURT:    Well, she's answered that one.  Okay?
    [KNUCKLES' ATTORNEY]:    Okay.

During direct examination of Knuckles' mother, the court questioned her aggressively about Knuckles' relationship with her boyfriend L.J.  The court's questions were decidedly not neutral in content or tone.

    THE COURT:    Who is [L.J.]?
    THE WITNESS:    Who is [L.J.]?
    THE COURT:    Yep.
    THE WITNESS:    That's someone [Knuckles] used to date.
    THE COURT:    How do you know that?
    THE WITNESS:    From he — because he went to school with my son.  And they dated when they were younger.
    THE COURT:    In Tennessee?
    THE WITNESS:    Yes.  No, Kentucky, actually.  Kentucky.
    THE COURT:    Did their relationship end after Kentucky?
    THE WITNESS:    I don't know when their relationship ended.
    <u>THE COURT:    You don't?  You don't know who your daughter dates?</u>
    THE WITNESS:    No, ma'am.  My daughter has been out west, a whole country away, for two years.  I don't know who she is talking to or what she is doing, who she is seeing.  I don't know when they split up.  I do not know.
    THE COURT:    Do you know about [L.J.]'s relationship with her here?
    THE WITNESS:    I am aware that she went out there — when she initially went out there, that's who — his family was out there.
    THE COURT:    And?
    THE WITNESS:    She has no one out there.  It was his people that was out there.
    THE COURT:    Was their relationship still going on at that point?
    THE WITNESS:    Yeah, I would assume at that point.  If she is going out to Washington, I would assume they were going to date —
    THE COURT:    Do you have any idea —

22

THE WITNESS:    — again or — you know.

THE COURT:    Do you have any idea what happened after that?

THE WITNESS:    No. I mean, I know about the accident with the baby, but that's about it. I don't know, you know, anything else, other than, you know, the accident, him falling asleep with the baby, and her taking him to the hospital, and then all this happened.

. . . .

THE COURT:    And what happened to [L.J.]?

THE WITNESS:    I have no idea. I think he went to jail. I think he might have been in jail when I was there, but I'm not sure. I don't know.

THE COURT:    And what happened —

THE WITNESS:    Needless —

THE COURT:    — to [L.J.] —

THE WITNESS:    — to say, I didn't even want to talk or speak or know anything about [L.J.] after this episode —

THE COURT:    You —

THE WITNESS:    — because, of course, I was upset.

THE COURT:    You didn't want to know anything more about him after that?

THE WITNESS:    No, I didn't. I didn't care where he was or nothing. My concern was my children — my grandchildren and my child. I didn't have any concern for [L.J.] at the time.

THE COURT:    To your knowledge —

THE WITNESS:    Once my children were in CPS[14] custody, I was worried about my chil- — my grandchildren and my child.

THE COURT:    To your knowledge, is he still in jail?

THE WITNESS:    I don't know. No - I have no idea where [L.J.] is at —

THE COURT:    You're not interested —

THE WITNESS:    — or what he is doing.

THE COURT:    You're not interested in knowing where this man is?

THE WITNESS:    No.

THE COURT:    You're not —

THE WITNESS:    I'm interested in getting my grandchildren home.

THE COURT:    And you're not interested anymore in knowing who your daughter is dating?

THE WITNESS:    Well, I'm sure if my daughter wants to share who she is dating, she will tell me.

THE COURT:    But you don't ask her?

THE WITNESS:    No, I don't.[15]

---

[14] Child Protective Services.

[15] Emphasis added.

23

When the Department attempted to "clarify" exhibit 77, the March 2016 response filed by the mother's former attorney concerning a Department social worker's visit summary, the court took over the questioning, repeatedly mischaracterized the mother's testimony, and ended with an inappropriate comment on the mother's credibility.

D I R E C T   E X A M I N A T I O N  (Resumed)
BY [DEPARTMENT'S ATTORNEY]:
Q.      So when we were last talking — oh, do you have the exhibit? Thank you.  You had said that there was a document that your lawyer had signed your signature to without your consent?
A.      Yes, that's what I was told by [the social worker].  I had never seen the document myself.
Q.      So looking at Exhibit 77, had you ever seen this document before?
A.      No.
Q.      Okay.  Give me a second here.
            THE COURT:    You were told by [the social worker] that [your former attorney] had forged your signature?
            THE WITNESS:    Well, [the social worker] was talking to me and going through this report here and I was saying that I didn't say some of the stuff in here, and she said, "It's got your name.  It's got your signature on it."  And I was like, "I have never even been around her to sign anything" you know, so I — and I had never seen this or, you know, agreed to it, so — but that's when I found out about it.  She was saying that she had had this paper in front of her and, you know, was kind of saying that I was blaming CPS for everything, and I told her I didn't know what she was talking about and she said it had my signature on it.  That's why I thought that [my former attorney] had signed my name.[16]
            THE COURT:    I'm assuming, folks, that this was a file document?
            [DEPARTMENT'S ATTORNEY]:    Yes.
            THE COURT:    Okay.  So let's take a look at that.  See the cause number here?  It says case No. 15-7?  See that?
            THE WITNESS:    Yes.
            THE COURT:    Okay.  This means that it's attached to this case file, right?
            THE WITNESS:    Yes.
            THE COURT:    And you know that this is a court file where all the documents filed in this case go, right?
            THE WITNESS:    Yes.

---

[16] We note the signature on exhibit 77 is "/s/."  The typed signature line below the /s/ states the attorney's name followed by "as reported by Mother" and the attorney's bar number.

24

THE COURT: Okay. But you're telling us that you were informed by the social worker that your attorney had forged your signature, and you never saw this report which was filed with the court?

THE WITNESS: She said that my name was signed to it, and I knew I hadn't signed, so I assumed that she had signed my name to it. Because she said my signature was on it, she didn't —

THE COURT: I'm not following your story at all here. Okay, you're telling me that you were informed by the social worker that your lawyer had forged your name on a document filed with the court, and you never looked at this report?

THE WITNESS: I had asked. She — [the social worker] was supposed to mail me a copy, but I never got a copy of it.

THE COURT: Well, how about talking to your next lawyer about getting a copy of this or looking in the court file yourself?

THE WITNESS: I don't recall having the court file, I'm sorry.

THE COURT: You've never seen this document before today?

THE WITNESS: This one in front of me, 77, no, I haven't.

THE COURT: Which was filed in the court file? You never saw it?

THE WITNESS: No, ma'am, I haven't.

THE COURT: Okay.

[DEPARTMENT'S ATTORNEY]: Just to step back just a second, so now that you have a chance —

THE COURT: I'm admitting 77 as an impeachment item. All right.

(Exhibit 77 is admitted.)

[DEPARTMENT'S ATTORNEY]: All right. Thank you. So —

[KNUCKLES' ATTORNEY]: I am sorry. Did you —

THE COURT: I'm admitting 77 for impeachment.

[KNUCKLES' ATTORNEY]: Oh, okay. Thank you.

. . . .

Q    (By [Department's attorney]) You had a chance to review this document over lunch; is that correct? 77?

A.    This one I brief- — I think I've — [my attorney] showed me briefly right before we come [sic] back.

Q.    Okay. Is — is this the document that [the social worker] read to you?

A.    Yeah, we went — we went through it over the phone, yes.

Q.    Okay.

A.    That's when I initially, you know, found out about it.

THE COURT: Was —

25

A.    I mean [my former attorney] did tell me, we did have a short phone conversation and told me she was going to submit something to the court but I didn't know what. We didn't talk about what. She didn't send me a copy of it or nothing like that. And then I get a call from [the social worker] and she was saying, you know, what was said and stuff and wanted to know my responses. And I had told her I hadn't — no knowledge of — of saying this or writing this up with [my former attorney] and she said that my name was signed to it, and that's when I got concerned.

THE COURT: So [the attorney] was still representing you then, right?

THE WITNESS: Yes.

THE COURT: And you still had access to your email, correct?

THE WITNESS: It was sporadic when I had Ms. Warner as an attorney with the email and stuff, but we did try to keep contact in phone — through the phone.

THE COURT: You had access to email, did you not?

THE WITNESS: When I would leave to get Wi-Fi[17], yes.

THE COURT: Well, there's Wi-Fi all over —

THE WITNESS: Yes.

THE COURT: — Tacoma and Pierce County, isn't there?

THE WITNESS: Yes.

THE COURT: Okay. So when you had access to Wi-Fi, which, really, you could have done by going anywhere near a Starbucks, okay, you had Ms. Warner's email address, correct? Your lawyer's email address, you had it?

THE WITNESS: We just talked by phone.

THE COURT: You never had your lawyer's email address?

THE WITNESS: I — I couldn't tell you. I might have it somewhere, but we just talked by phone is the only —

THE COURT: Are you seriously telling me that in all your representation with Ms. Warner you never were aware she had an email address?

THE WITNESS: We just didn't talk about email. We talked by phone.

THE COURT: Is that a "yes" or "no" that you knew she had an email address?

THE WITNESS: Yes.

THE COURT: Okay. And when you talked by phone, I assume you knew her phone number?

THE WITNESS: Yes, I had it in my phone.

---

[17] Wireless fidelity.

26

THE COURT: So if you found out that allegedly she put in a document signed by you — or by her purporting to be you that had been filed in the court file, did you email her or call her?

THE WITNESS: We spoke on the phone briefly, but she had to go to take care of her horses and then I didn't hear back from her.

THE COURT: Ever?

THE WITNESS: Not until she told me she wasn't going to be my lawyer at court no more. We didn't talk again.

THE COURT: I see. Okay. I'll tell you bluntly, okay, I don't believe you.

THE WITNESS: I'm sorry, Your Honor. I'm just telling the truth.

THE COURT: I don't think you are, Ms. Knuckles. Back to you, [Department's attorney].[18]

The tenor of the court's questions and remarks was that of an advocate, not a neutral arbiter.

Although we recognize it is appropriate and often necessary for a judge to ask questions of witnesses in a bench trial, and while such questioning is particularly important in cases where the safety of the child is at stake, we conclude the cumulative effect of the interjections and questions in this case demonstrated a lack of impartiality, constitutes manifest constitutional error, and violated Knuckles' due process right to a fair trial. The court asked an excessive number of questions, elicited evidence in support of the Department's case, aggressively challenged the credibility of the mother and other witnesses she called to testify, and helped elicit favorable evidence on behalf of the Department but foreclosed the mother's attempts to cross-examine or elicit

---

[18] Emphasis added.

27

favorable testimony. In so doing, the court crossed the line from neutral arbiter to advocate.[19]

Because the court violated the mother's due process right to a fair trial, we reverse the order terminating the mother's parental rights to B.W.K. and remand for a new trial before a different judge.

Schindler, J.

WE CONCUR:

Mann, ACJ

Trickey, J.P.T.

---

[19] We note this is not the first time we have reviewed a challenge to the interjections and questions of this trial judge. In In re Dependency of G.B., 187 Wn. App. 1017, 2015 WL 1979501, at *7, the same judge "questioned virtually all of the witnesses." The issue on appeal in G.B. was whether "certain remarks . . . and the court's active participation" in the proceedings "exhibited bias and lack of impartiality." G.B., 2015 WL 1979501, at *1. The Department conceded in its brief that the judge made "harsh comments" about the father and "did not cautiously guard its comments." The opinion focuses on whether the judge harbored "actual or potential bias" against the father and concluded the record did not show such bias. G.B., 2015 WL 1979501, at *3-*8. Because the court participated in the proceedings "without aligning herself with counsel for any of the parties," we rejected the due process challenge to the court's interjections and questions. G.B., 2015 WL 1979501, at *7-*8.